Vincent L. HILLYER and Manuchehr Riahi, Plaintiffs,

v.

PAN AMERICAN PETROLEUM CORPORATION, a corporation, Defendant.

Civ. No. 5178.

United States District Court
N. D. Oklahoma.

Dec. 20, 1963.

See publication Words and Phrases for other judicial constructions and definitions.

C. Ray Robinson, Merced, Cal., and Byron Boone, Boone & Ellison, Tulsa, Okl., for plaintiffs.

R. D. Hudson, Hudson, Hudson, Wheaton, Kyle & Brett, Tulsa, Okl., and W. W. Heard, Gen. Counsel, Pan American Petroleum Corp., Tulsa, Okl., for defendant.

BOHANON, District Judge.

This is a diversity action filed in the United States District Court for the Northern District of Oklahoma. A jury was waived and the case tried to the Court on the question of liability only.

Plaintiff Vincent L. Hillyer is a citizen of the State of California, and the plaintiff Manuchehr Riahi is a citizen of the Nation of Iran. Defendant Pan American Petroleum Corporation is a Delaware Corporation, with its principal place of business in Tulsa. Pan American Petroleum Corporation and Pan American International Oil Company so far as this action is concerned are one and the same corporation, both being wholly owned subsidiaries of Standard Oil Company of Indiana. The matter in controversy exceeds the sum of $10,-000, exclusive of interest and costs.

Hillyer at the times relevant herein was the husband of Princess Fatima, the sister of the Shah of Iran. Subsequently they have been divorced. Riahi was a prominant businessman in Iran whose wife was the sister of the wife of Prince Abdorreza, a half-brother of the Shah.

National Iranian Oil Company, generally referred to as "N. I. O. C.," was at all times relevant to this action wholly owned by the Government of Iran and was its designated oil company and agent for the handling of the oil interests of that Nation.

Some time prior to September, 1956, one Mr. Morrow, who was one of the principal shareholders of Cuban American Oil Company, advised a Mr. Klein, who was also a principal stockholder of Cuban American Oil Company, that through Hillyer and his associates there was a possibility for a responsible American oil company to negotiate an oil exploration and development contract with the Government of Iran, through National Iranian Oil Company. Morrow set about to see if an arrangement could be worked out between Cuban American Oil Company with a responsible American oil company and the Government of Iran whereby Cuban American Oil Company could receive a carried working interest out of any interest which a responsible American oil company might receive in a deal negotiated for an exploration contract. An effort was made by Hillyer to interest other major oil companies in Iranian oil but with no success.

Klein, during the month of September, 1956, having been informed by Morrow that the time was opportune to work out a deal in Iran, called to inquire if defendant would be interested in negotiating for an oil exploration and development contract. Klein thereafter advised Mr. Solliday, who was the Executive Vice President of the defendant, that he and Morrow had contacts through Hillyer with the Shah of Iran and they felt it very possible that defendant could obtain a very favorable oil development contract in Iran covering many thousands of square miles upon certain terms and conditions not here pertinently relevant.

Klein proposed to Solliday that they should go to Iran and attempt to negotiate such a contract, and if one was obtained Cuban American Oil Company would receive a 15 per cent carried working interest. Solliday agreed to go to Iran, but there was no agreement reached between Cuban American and the defendant concerning a carried working interest.

During the month of October, 1956, Solliday, Klein, Morrow and one R. O. Mitchell, a geologist in the employment of the defendant, went to Tehran, Iran, to explore the possibilities of a contract covering lands favorable for oil production and while there they, together with Hillyer, had meetings with the Shah and

some of the members of the Board of Directors of the National Iranian Oil Company; and as a result of these meetings, Solliday and other parties learned of the general requirements necessary to obtain an exploration contract. These terms at the time were not acceptable to the defendant and purported negotiations were discontinued. At this time in the negotiations, Solliday understood that Hillyer and Riahi were to receive a one-half interest in whatever interest Cuban American was to receive from any negotiated oil exploration contract, but there was no agreement in writing reached at the time as to this percentage.

The negotiations between all of the parties up to this stage contemplated the procurement of an oil exploration contract with the Nation of Iran by private negotiations, and Cuban American Oil Company was to receive, as a commission, a certain carried working interest, and from this working interest Hillyer and Riahi were to receive one-half of the commission to be paid by defendant to Cuban American Oil Company. During this period of time the actual contractual relationship between the parties was between the defendant and Cuban American Oil Company, on one hand, and Cuban American Oil Company and plaintiffs on the other hand, and Hillyer and Riahi were looking to Cuban American Oil Company for their compensation.

In March of 1957, Hillyer and Riahi requested of the defendant a written agreement, by-passing Cuban American Oil Company, setting forth the interest they were to receive from defendant as a result of a negotiated contract for oil exploration with the Nation of Iran. Plaintiffs desired this written agreement for several reasons, among which was to show to certain influential persons that such an agreement existed, and these persons would be assured of being paid a certain portion of the proceeds of the contract, if obtained. Pursuant to this request, the defendant sent to plaintiffs a letter agreement dated April 5, 1957,

and which was accepted by the plaintiffs. This letter is set out in full as follows:

"PAN AMERICAN PETROLEUM CORPORATION

Tulsa, Oklahoma
April 5, 1957

Mr. Manuchehr Riahi and
Mr. William Wagner
P. O. Box 1202
Tehran, Iran

Gentlemen:

This is to confirm our verbal understanding reached during my visit to Iran in October, 1956.

Our Company agrees to have you represent us in Iran in working out an agreement with the Iranian Government and the Government owned and designated company for the development of oil and gas in Iran generally on the following terms:

1. The Government of Iran is to receive approximately 50% of the net operating profits in the form of royalties and income taxes.

2. The Government owned and designated company will be invited to participate to the extent of a 25% working interest. In other words, on the basis we are proposing, the Government and its company together would receive 62½% of the net operating profits and Pan American Petroleum Corporation (Standard Oil Company of Indiana) and its associates would receive the remaining 37½% of the net operating profits.

3. If Pan American Petroleum Corporation enters into such an agreement with the Iranian Government, you will receive a carried interest equal to 3.75% of the full working interest our Company and associates acquire in the deal, subject, of course, to payment of taxes and royalty to the Iranian Government.

Assuming that the Iranian Government will get 50% of the net, this would then give you 1.875% of the net profit, or 5% of our net profit. It is our mutual understanding that Cuban American Oil Company will receive the other 5% of our net, or 1.875% of the total net.

If Pan American Petroleum Corporation does not enter into such an agreement with the Iranian Government, Pan American Petroleum Corporation shall have no obligations to you or Cuban American Oil Company.

If the Iranian Government officials having authority to deal with these matters are interested in negotiating in the near future a contract basically along these lines, we shall come to Iran to conclude an agreement.

It should be understood that our proposal to you is limited to those instances where Pan American Petroleum Corporation and its associates with your assistance acquire areas in Iran for development of oil and gas under contract with the Iranian Government and the Government owned and designated company, as set forth above, and that Pan American Petroleum Corporation and its associates shall have no obligations to you or Cuban American Oil Company under this proposal in the event areas are offered for competitive bids by the Iranian Government and are so acquired by Pan American Petroleum Corporation and its associates.

If the foregoing correctly outlines in a general way the basis for an agreement, will you kindly return to me an executed copy hereof within thirty (30) days after the date hereof.

Very truly yours,
/s/ A. L. Solliday
A. L. Solliday

ACCEPTED AND APPROVED THIS
28th day of April, 1957
/s/ Manuchehr Riahi
Manuchehr Riahi
/s/ William Wagner
William Wagner"

William Wagner, who signed this agreement, was the agent of and acting for Hillyer.

Shortly after the agreement above set forth was entered into, it became generally known and anticipated that the Government of Iran would probably adopt legislation which would require competitive bidding for oil development contracts covering certain designated areas owned by the Nation. This legislation was passed and adopted on July 31, 1957, whereby National Iranian Oil Company, as the Nation's agent, was authorized to declare certain districts open for the purpose of development contracts for petroleum and to invite offers from responsible oil companies to submit bids. The Act is quite lengthy but in effect sets out the terms and conditions upon which exploration would be required of any successful bidder. The Act is set forth in full as Exhibit A attached to defendant's Motion for Summary Judgment. The Act also provides for competitive bidding in that it establishes procedures and terms whereby all offers received by the National Iranian Oil Company are to be evaluated equally and on the merits and that contracts are to be awarded solely on the basis of the terms of the offer and competence and qualifications of the offeror. After the passage of the Petroleum Act above mentioned, the letter agreement dated April 5, 1957, supra, became, for all practical purposes, inoperative because it specifically provided that defendant would have no obligation to plaintiffs in the event the areas were offered (by National Iranian Oil Company) for competitive bids and were so acquired by the defendant.

Prior to the passage of the oil act above mentioned, Hillyer and Riahi introduced

representatives of the defendant to the Shah and other influential persons in the nation of Iran with the view of obtaining a negotiated contract for oil development for the defendant. An employee of Riahi, Mr. Mahvi, performed certain administrative services for the defendant and its agents, such as obtaining office space, geological data, telephones, office furniture, transportation, Government permits, and in general attempted to smooth the way for the defendant's agents.

In November of 1957, Mr. Solliday, Executive Vice President of the defendant, met with Mr. Riahi in Rome, Italy, and in Paris, France. Riahi requested that the defendant enter into a new and separate agreement whereby Riahi would receive 4% of the defendant's net profits and Hillyer would receive 1% under any oil development contract which defendant might make with N. I. O. C. of Iran. Riahi requested separate agreements, stating that he did not want Hillyer to know that he was to receive 4% instead of 1% that Hillyer was to receive, and he represented that 3% of his 4% was to be paid out for distribution for assistance of undesignated persons. No agreement was reached, either orally or in writing, to carry out Mr. Riahi's request.

In December, 1957, Hillyer and Riahi wrote Solliday requesting written agreements as proposed by Riahi to Solliday in Rome and Paris. On January 30 and February 4, 1958, Solliday wrote Riahi and Hillyer, respectively, stating that the agreement of April 5, 1957, was ineffective because of the passage of the Petroleum Act and that the question of whether defendant should enter into a new agreement with them must be left to C. F. Dohm, President of the newly formed subsidiary, Pan American International Oil Company.

In November, 1957, the National Iranian Company declared certain lands open for bidding on February 1, 1958, in accordance with the Petroleum Act and the procedures set forth in the announcement.

Shortly before the date for the submission of bids to National Iranian Oil Company, defendant decided to submit a bid, and on March 31, 1958, a bid was submitted in accordance with the terms of the Petroleum Act. Defendant's bid was accepted on April 24, 1958, and approved on June 5, 1958, by an Act of Parliament and Royal Decree. Several bids were submitted, six to be exact, and the bid of the defendant was accepted solely upon its merits and the advantages to the Nation of Iran.[1]

1. "Le Add. Naftmelli    Central Office
P. O. Box No. 1863   Ave. Sepahbod Zahedi
Tel. No. 69871          Tehran

NATIONAL IRANIAN OIL COMPANY

This is to certify that I, Ali Ashraf Sheibani, Secretary to the Board of Directors of the National Iranian Oil Company, Teheran, Iran, have examined the files of the National Iranian Oil Company pertaining to bids on District 1, submitted March 31st, 1958, and, hereby states that:

"1. Pursuant to the Petroleum Act of July 31st, 1957, District No. (1) of the Petroleum Districts of Iran, was declared open for public bidding, as per pre-announcement No. 228–1 dated 2nd November, 1957, (Exhibit 1) and final announcement No. 228–2 dated 1st February, 1958, (Exhibit 2).

"2. According to stipulations made in the mentioned announcements out of 57 applicants twenty one companies or group of companies satisfied the National Iranian Oil Company as to their competence; and were consequently invited to bid.

"3. Up to the 31st March, 1958, being the closing date for presentation of bids, six bids were received from companies who had satisfied the National Iranian Oil Company of their competence as follows:

" a) From Idemitsu Kosan Company Ltd., of Japan for an area of 8,000 sq.km., 50% participation of N.I.O.C., no cash bonus, $8,000,000 exploration commitment.

" b) From Pan American Petroleum Corporation of Delaware, U.S.A. for an area of 16,000 sq.km., 50% participation of N.I.O.C., $25,000,000 cash bonus, $82,-000,000 exploration commitment.

" c) Secony Mobil Oil Company of U. S.A. in association with Gelsenberg-Benzin Aktiengesellschaft of Germany and Standard Oil Company of Ohio for an area of 6,500 sq.km., no participation of N.I.O.C., $11,000,000 cash bonus plus

Plaintiffs were in no way instrumental in the securing of the oil concession from the National Iranian Oil Company and the Government of Iran and their services were performed under the written agreement of April 5, 1957, which provided that they would be entitled to compensation only if a negotiated concession was obtained on the terms therein set forth.

Plaintiffs, in their Amended Complaint, set forth four alleged causes of action. In the first count, they allege an oral contract entered into in October, 1956, by the terms of which plaintiffs promised to represent the defendant in Iran in securing for the defendant an oil and gas exploration and development contract, and the defendant promised that if it obtained such an oil and gas contract it would pay to each of the plaintiffs the sum of $25,000 annually during the oil and gas exploration and development contract, and in addition thereto to pay each of the plaintiffs a sum equivalent to 2½% of the net profits of the defendant for the duration of the contract.

Count 2 of the Complaint alleges that on April 5, 1957, plaintiffs and defendant entered into a written contract identical with the alleged oral contract set out in Count 1, except it did not mention the $25,000 per year to be paid to each of the plaintiffs for the duration of the contract if obtained.

Count 3 of the Complaint alleges that the written contract mentioned in Count 2, dated April 5, 1957, was amended or superseded by an alleged oral contract between the plaintiff Riahi and A. L. Solliday some time during the period be-

$10,000,000 when oil discovered plus $1,000,000 prepaid rental. No exploration commitment.
" d) Joint bid by Standard Oil Company of New Jersey, U.S.A. and Bataefsche Petroleum Maatschappij of the Netherlands for an area of 6,500 sq.km. no participation of N.I.O.C., $25,905,000 cash bonus in cash or $7,905,000 in cash, $10,000,000 in six years, another $10,000,000 in six years if operations continue and another $30,000,000 in ten years if operation continues, $4,095,000 prepaid rental and $10,000,000 exploration commitment for the first six years and $2,000,000 per year for next six years if operations continue.
" e) Cities Service Petroleum Corporation of U.S.A. in association with the Atlantic Refining Company, Sinclair Oil Corporation and Continental Oil Company; all of U.S.A. for an area of 16,000 sq.km., 50% participation of N.I.O.C., bonus of $5,000,000 if bid made by Atlantic Refining Company accepted too. Exploration commitment $35,000,000.
" f) Atlantic Refining Company, of U.S.A. in association with Cities Service Petroleum Corporation, Sinclair Oil Corporation, Richfield Oil Corporation and Continental Oil Company all of U.S.A. for an area of 16,000 sq.km., 50% participation of N.I.O.C., cash bonus of $5,000,000 if Cities Service bid accepted too. Exporation commitment $70,000,000.
"Being quite apparent that amongst bids accepting N.I.O.C.'s participation the proposal of Pan American Petroleum Corporation was the best and amongst those without N.I.O.C. participation the joint Esso-B.P.M. proposal being the best a detailed study was made which proved that in case of oil being found within the Area which would justify a production of 100,000 b/d. Pan American's bid would be more profitable to Iran to the ratio of 1.4 to 1 approx. and in case of a production of 500,000 b/d being justified the same ratio would increase to 1.8 to 1 approx.
"N.I.O.C. having also obtained an independent opinion from Mr. Olaf Sundt, Consultant, which agreed with N.I.O.c's own finding decided to award the contract to Pan American Petroleum Corporation.
"The contract was duly signed on April 24th, 1958, and enacted on June 5th, by an Act of Parliment and Royal Decree of His Imperial Majesty.

Ali Ashraf Sheibani
/s/ A. A. Sheibani

Dated this 30th day of May, 1961."

"Le Add. Naftmelli        Central Office
P. O. Box No. 1863  Ave. Sepahbod Zahedi
Tel. No. 69871                Tehran

NATIONAL IRANIAN OIL COMPANY
30th May, 1961.

This is to certify that Mr. Ali Asharaf Sheybani (Identity card No. 14775 issued at Tehran 4th District) is the Secretary of the Board of the National Iranian Oil Company.

Chairman of the Board of Directors,
/s/ A. Entezam
Abdollah Entezam.

ASH/AG"

tween November 18 and November 20 in Rome, Italy, whereby it was orally agreed between the parties that the written agreement of April 5, 1957, would be cancelled and that the plaintiff Hillyer would receive compensation for services in the past and for future services to be rendered by him 1% of the net profit of the defendant under any oil exploration and development contract that might be obtained from the Government of Iran or the Government-owned and operated company, and that Riahi would receive 4% of the net profits for past and future services. Plaintiffs allege that they performed all the terms and conditions of each of the alleged contracts set out in Counts 1, 2 and 3.

As to Count 1, plaintiffs prayed for damages in the sum of $100,000, for alleged loss of salary and for an accounting of 2½% to each of the plaintiffs of the net profit of the defendant. In Count 2, plaintiffs prayed for an accounting from the defendant for 2½% of the net profits of the defendant to each of the plaintiffs and a declaration of their rights to receive a similar percentage in the future. In Count 3 the defendants prayed for judgment for an accounting to each of them of 1% of the net profit of defendant.

In Count 4 of the Complaint, the plaintiffs allege a cause of action based upon quantum meruit in that they represented the defendant in the nation of Iran and performed valuable services for the defendant in the securing of the oil exploration and development contract obtained by the defendant, and they set out certain detailed services which they performed, and pray for judgment in favor of each of the plaintiffs for $37,-500,000, or a total of $75,000,000.

The defendant generally denied the allegations of the Complaint except it admitted that on April 24, 1958, pursuant to the Petroleum Act of July 31, 1957, it entered into a contract with National Iranian Oil Company, the Government-owned and designated company, for joint exploration and development for petroleum in a designated area in the Persian Gulf; that this contract became effective June 5, 1958. The defendant admitted it began exploration under this contract and discovered oil in commercial quantities.

Defendant asserted that its contract between plaintiffs dated April 5, 1957, supra, contained the entire agreement between the parties; defendant further alleged that plaintiffs were not entitled to receive any compensation from the defendant in that the development contract obtained by the defendant on April 24, 1958, was obtained by competitive bid and therefore under the agreement of April 5, 1957, defendant had no obligation to plaintiffs, or either of them. Defendant denied that the agreement of April 5, 1957, was cancelled or amended, and that plaintiffs were not entitled to any of the net profits alleged to be due them under said alleged oral contract, and further denied that they were indebted to the plaintiffs under the claim set forth in Count 4, and that the alleged agreements set forth in the Amended Complaint were illegal, unenforceable and void as against public policy. These constitute generally the essential claims of the respective parties.

The Court feels at this point it should be noted that in certain letters between the parties it is indicated that plaintiffs had influence with high government representatives of the Nation of Iran and that this influence could be used to the advantage and benefit of the defendant. The Court finds that all intimations of any influence that could be used upon any of the officials of Iran are unfounded and there is no evidence to support such intimations. So far as the record in this case shows, and the Court so finds, the officials of the Iranian government at all times acted in good faith and for the benefit of the nation and its people.

The alleged oral agreement entered into in October, 1956, as set out in Count 1 of the Complaint, was merged into and superseded by the written contract set out in Count 2, and all oral negotiations and stipulations which preceded or accompanied the execution of the written

contract was merged therein. Title 15 O.S., Section 137, provides:

"Writing excludes oral negotiations or stipulations:

"The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter, which preceded or accompanied the execution of the instrument."

The terms and conditions of the written contract may not be varied by parol evidence. The promissory obligations set out in the written contract were contractual acts and were definite and certain.

In Reed v. Moore, 54 Okl. 354, 154 P. 348, a tenant under a written lease asserted that the landlord also orally agreed to make certain repairs and improvements. The Court refused to allow parol evidence thereon, and at page 350 of 154 P. said:

"We are of the opinion that parol evidence that the deceased agreed to repair and improve the building was incompetent, for that it would tend to vary the terms of the written contract of lease, and the fact that such promise may have been a part of the consideration did not take it without the rule, because it was a contractual act, and to prove it by parol would be adding another term to the written contract."

It will be noted that although the first paragraph of the letter of April 5 states "This is to confirm our verbal understanding reached in my visit to Iran in October, 1956" the remainder of the letter sets out in specific detail the terms of the agreement.

In Russell v. Barnes Foundation, (D.C. Pa.) 50 F.Supp. 174, it was agreed under a similar situation that the written agreement was merely an acknowledgment that an oral agreement had been entered into and hence parol evidence would be competent to prove all the terms of the oral agreement. The Court said:

"Defendant's contention cannot be sustained. The letter goes far beyond a mere acknowledgment of the existence of a verbal agreement. It 'confirms' the verbal agreement and sets forth explicitly the duties of plaintiff, the services which he was to render, the compensation therefor, and the duration of the employment. After reciting these terms and conditions, it contains a subscript to be signed by plaintiff before witnesses stating that he 'agrees to the terms and conditions of the above agreement entered into between myself and the Barnes Foundation.' The 'above agreement' obviously refers to the contents of the letter rather than to any prior verbal agreement, the terms and conditions of which were not specified in the letter. The content and form of the letter and the inclusion of the subscript, which was signed by plaintiff and duly witnessed, is utterly inconsistent with the contention that it was intended merely as an acknowledgment that a verbal agreement, containing terms and conditions other than those specified in the letter, had been entered into by the parties. Under these circumstances, the letter constitutes the sole agreement between the parties, and prior oral arrangements or negotiations as to matters related to the subject of the written agreement may not be considered. Gianni v. R. Russell & Co., Inc., 281 Pa. 320, 126 A. 791."

It appears quite evident under Oklahoma law and under the generally accepted rule that the alleged oral contract of October, 1956, was merged into the written contract of April 5, 1957, and in this written contract it is specifically provided:

"It should be understood that our proposal to you is limited to those instances where Pan American Petroleum Corporation and its associates with your assistance acquire areas in Iran for development of oil

and gas under contract with the Iranian Government and the government owned and designated company, as set forth above, and that Pan American Petroleum Corporation and its associates shall have no obligations to you or Cuban American Oil Company under this proposal in the event areas are offered for competitive bids by the Iranian Government and are so acquired by Pan American Petroleum Corporation and its associates."

The evidence does not support the claim of plaintiffs that the April 5, 1957 contract was cancelled and superseded by an oral contract between the parties in Rome, Italy, or Paris, France, in November, 1957, as alleged and stated in numerical paragraph 17 of the Amended Complaint. The Court finds the plaintiffs recognized that since the passage of the Petroleum Act by the Nation of Iran, which became effective July 31, 1957, that their contract of April 5 had little or no value. Realizing this situation, Riahi met with A. L. Solliday in Rome, Italy, and Paris, France, for the purpose of seeking an amendment or a change in the April 5, 1957 contract so that plaintiffs would receive a share in the profits of any oil exploration contract between defendant and the Nation of Iran, however secured. The defendant did not assent or agree to the requested changes, and consequently there was no meeting of the minds or mutual consent between the parties, and therefore no contract resulted, leaving in effect, for whatever it was worth, the April 5, 1957 agreement.

The admitted facts disclose that in February and March of 1958 Hillyer went to New York City, New York, to visit with the officials of the defendant company concerning his claim for compensation for services rendered up to the time of the defendant's submitting its bid to the Iranian National Oil Company for the concession in question. That while in New York City, the defendant company paid to Mr. Hillyer the sum of $24,000. The Court finds that the defendant company made this payment for the purpose of public relations or otherwise to acquire the peace and good will of the plaintiff Hillyer. Later, and in the summer of 1958, after the defendant company had been awarded the concession contract, Mrs. Hillyer, the then wife of the plaintiff, came to the United States with her brother, the Shah, and while here contacted Mr. Solliday and a Mr. Bullard, Vice President and President of the defendant company, respectively, explaining to them that she represented her husband and that her husband, Mr. Hillyer, felt that he had not been treated properly by the defendant in the defendant's negotiations in Iran and that she desired to settle their differences and asked for $500,000, stating that unless the defendant made some kind of a monetary contribution her husband would continue to harm and make trouble for the defendant company in its operations of the awarded concession in Iran; Hillyer had already made derogatory statements about defendant to the U. S. State Department; and after consideration by the defendant company, it caused to be paid to Mrs. Hillyer, who represented that she was acting for her husband, the sum of $250,000. This sum was withdrawn from the defendant company's funds and labeled as commissions. The Court finds that the payment made to Mrs. Hillyer was made by the defendant not as a recognition of any contractual obligation but as a matter of public relations and to acquire and have the good will of Mr. and Mrs. Hillyer in the company's operations in Iran. The Court finds that neither of the payments hereinabove referred to and made to the Hillyers was in recognition of any legal or moral obligation but were made for the purpose of acquiring and having pleasant relations with Mr. and Mrs. Hillyer. The payments were gifts or gratuities only. The defendant had already invested $25,000,000 in Iran, and it was advisable to have the good will of the Hillyers.

The record further discloses that the defendant company used the services of

a Mr. Mahvi, who was an associate of Riahi, commencing in the fall of 1957 until March, 1958. That Mahvi was the person who performed the services of securing offices, secretarial help, telephone, transportation, geological data and other services referred to in the record, for which the defendant company proposed to pay Mr. Mahvi the sum of $12,000, but before Mahvi would accept the $12,000, he requested the privilege of securing the approval of Mr. Riahi. The Court finds that Mr. Riahi did approve the payment by the defendant company to Mahvi of $12,000, but suggested that the defendant company should keep Mr. Mahvi on its payroll for another six months period on the basis of $2,000 per month, to which suggestion the defendant company agreed and did pay Mahvi the sum of $12,000 for the additional period of time, and the record shows that Mr. Mahvi is still an employee of the company in Iran.

■ Considering now the fourth count of the Complaint, which is a claim for the reasonable value of the services rendered by plaintiffs to the defendant, the Court finds and concludes that the alleged services rendered by plaintiffs were in no way helpful or instrumental in defendant's obtaining the oil exploration contract. The services which plaintiffs rendered were done with the hope of satisfying the terms of the April 5 contract, and thereby entitling them to compensation as therein provided.

The April contract is clear and unambiguous, and was accepted and approved by the plaintiffs.

■ "Reasonable compensation," or "quantum meruit," refers to that class of obligations imposed by law, without regard to the intention or assent of the parties bound, for the reasons dictated by reason and justice. Where the relations of the parties can be ascertained from an express contract as explicit as the one at bar, recovery is not permitted for the reasonable value of the services rendered, unless the parties claiming reasonable value for their services were prevented from performance by the other party.

See Carpenter v. Josey Oil Company (8 Cir.), 26 F.2d 442; Federal Royalty Company v. Knox and Others (5th Cir.), 114 F.2d 78.

Based upon the foregoing facts and conclusions, plaintiffs' claims for relief under Counts 1, 2, 3 and 4 are denied.