Vincent L. HILLYER and Manuchehr Riahi, Appellants,

v.

PAN AMERICAN PETROLEUM CORPORATION, Appellee.

No. 7725.

United States Court of Appeals
Tenth Circuit.

June 25, 1965.

Mary C. Fisher, Merced, Cal. (C. Ray Robinson, Merced, Cal., Byron V. Boone and James O. Ellison, Tulsa, Okl., on brief), for appellants.

Robert D. Hudson, Tulsa, Okl. (W. W. Heard, Tulsa, Okl., on brief), for appellee.

Before MURRAH, Chief Judge, LEWIS, Circuit Judge, and DOYLE, District Judge.

MURRAH, Chief Judge.

This is an appeal from a judgment of the trial court denying appellants compensation for their efforts in connection with an oil development contract in Iran between appellee, Pan American Oil Company, and the government of Iran. The claim is grounded in three separate and inconsistent theories of recovery on the same subject matter—two in con-

tract, one in quantum meruit. Jurisdiction is based upon requisite diversity of citizenship and amount in controversy.

The first theory is based upon an alleged oral contract of October, 1956, whereunder it was agreed that in return for their efforts in the negotiation of an oil development contract with the Iranian Government, Pan American would pay each appellant $25,000 annually during the life of the contract and 2½% of its net profits. The second theory is based upon a subsequently executed letter contract in April, 1957, by the terms of which Pan American agreed to pay appellants 5% of its net profits derived from a negotiated development contract. Finally, and alternatively, if neither contract is sustainable, appellants claim reasonable compensation for their efforts which Pan American solicited and advantageously used. Pan American denied any obligation to the appellants under any alleged contract, oral, written or implied. The trial court denied relief under any and all of the alleged theories. See Hillyer v. Pan American Oil Company, D.C., 225 F.Supp. 425.

While the theories of the claim are separate and inconsistent, no one denies the right of appellants to recover under any legally sustainable theory supported in fact. See Blazer v. Black, 10 Cir., 196 F.2d 139; Berger v. State Farm Mut. Automobile Insurance Co., 10 Cir., 291 F.2d 666.

It was agreed at pretrial that the question of liability under all the asserted theories would be tried to the court without a jury and, in the event liability was established on any theory, the amount of damages would be tried to a jury. The basic and underlying facts, either undisputed or fairly established and relied upon to support the respective theories, may be stated as follows.

Appellant-Riahi was a well-placed and successful businessman in Iran related by marriage to the Shah. Appellant-Hillyer, a native of the United States, was also related by marriage to the Shah. Both were members of the royal household and

entrepreneurs of Iranian government business with foreign enterprises. In 1953 Riahi came to the United States for the purpose of interesting American oil companies in the exploration and marketing of Iranian oil. While in the United States, he met Wagner, Hillyer's business agent, and through him became associated with Hillyer. Working together, Riahi and Hillyer were able to interest Morrow, a principal stockholder of the Cuban American Oil Company. Morrow went to Iran, and appellants arranged an audience with the Shah and meetings with other influential government officials. Morrow later told Klein, President of Cuban American, of his investigation and the possibility of negotiating a profitable oil contract with the Iranian government. They decided to attempt to interest other American oil companies in a venture with a carried interest to Cuban American. Klein contacted Pan American Oil Company, where he was apparently well known, and was referred to Solliday, the Executive Vice President. Klein and Morrow apparently represented to Solliday that an oil development contract might be negotiated on the basis of 75% Working Interest to Pan American, 25% Working Interest to the National Iranian Oil Company and 50% of the net profits of the venture to the Iranian government. Under such arrangement, the Cuban American Oil Company would be carried for 10% of Pan American's acquired interest.

Solliday, Morrow and Klein went to Iran in October of 1956. During this visit, under the sponsorship of appellants, they met with the Shah and members of the Board of Directors of the National Iranian Oil Company (NIOC), a wholly owned government agency. After intensive negotiations, Solliday was given to understand that NIOC must participate in any oil venture with any foreign oil company on the basis of 50% Working Interest with the national government receiving 50% of the net profits as for income tax.

Riahi testified that in a conference with Solliday in Iran the matter of com-

pensation to his group was discussed, and Solliday stated that in view of NIOC's requirement of 50% Working Interest it was "impossible to give us such a high rate of carried interest". After further discussion, "eventually we agreed upon a figure of 10% which he was willing to give the whole party" and "this carried interest will be divided half between Mr. Klein and Mr. Morrow on one side and Mr. Hillyer, Mr. Wagner and myself and my associates on the other side"; and in addition "Hillyer and Riahi were to receive $25,000 per year during the life of any contract". Riahi further testified that when alone with Mr. Morrow he asked whether "we should write down our agreement with Mr. Solliday", and Morrow said he didn't "think" it necessary because "you can rely on the words told to you by Mr. Solliday who is executive vice president of the company, and it is agreed upon and you don't have to worry about it." No development contract was entered into but Solliday returned to the United States encouraged to believe that some mutually satisfactory arrangements with the Iranian government could be worked out.

Thereafter, Klein wrote to Hillyer with Solliday's approval suggesting that Hillyer propose to the Shah that NIOC's participation in the contract be reduced to 25%. Hillyer then wrote Morrow indicating that the Iranian government might be willing to negotiate on the basis of 75%–25% with 50% of the net profits to the government. Apparently nothing of importance happened, but Riahi and Hillyer continued their friendly intercourse with responsible government officials urging the advantages of an oil development contract with Pan American as one of the largest oil companies with assets of $2 billion and a market of 800,000 barrels of oil, of which it produced only one-half. According to Riahi, in the course of his negotiations it became important for his undisclosed "collaborators" to know about "my commission". "They insisted that they wanted me to give them [something] in writing that they might have in case Pan American obtained a concession in Iran. So, I decided to ask Mr. Solliday to give me something in writing and that was in the first months of 1957".

In these circumstances Hillyer (apparently at the suggestion of Riahi) wrote Morrow in March of 1957 asking him to ascertain whether Solliday would be willing to make separate written agreements with appellants and Cuban American, setting forth the interest each would receive if an oil contract were subsequently effected. Hillyer enclosed a proposed agreement acceptable to the appellants. Klein referred the matter to Solliday and, amenable to the request Solliday sent the appellants the letter contract of April 5, 1957. The letter proposed that if Pan American with the assistance of Riahi and Hillyer should obtain an oil development contract with the Iranian government on the basis of 75%–25% Working Interest to Pan American and NIOC respectively with 50% of the net profits to the Iranian government (i. e. $62\frac{1}{2}$% of the net operating profits to the Iranian government and its company and $37\frac{1}{2}$% to Pan American and its associates) "you will receive a carried interest equal to 3.75 of the full Working Interest subject, of course, to payment of taxes and royalty to the Iranian government, or a net of 1.875% of the net profits or 5% of our net profit. And, Cuban American Oil Company would receive a like amount." If the Iranian government is interested in "negotiating in the near future a contract basically along these lines, we will come to Iran to conclude an agreement". But, if Pan American does not enter into such a contract it would have no obligation to "you or the Cuban Oil Company". The letter went on to specifically state, "our proposal to you is limited to those instances where Pan American Petroleum Corporation and its associates with your assistance acquire areas in Iran for development of oil and gas under contract with the Iranian Government and the Government owned and designated company, as set forth above, and that Pan American Petroleum Corporation and its

associates shall have no obligations to you or Cuban American Oil Company under this proposal in the event areas are offered for competitive bids by the Iranian Government and are so acquired by Pan American Petroleum Corporation and its associates." In due time both Riahi and Hillyer accepted the letter proposal and returned it to Pan American with a covering letter stating:

"In the event the Iranian Government should decide to pass a law inviting bids for these areas to be submitted, we shall be willing to assist your company in every way possible so that it may be a successful bidder. If the competitive bidding procedure becomes necessary, then we trust to your fairness to see that Cuban American Oil Company and we are compensated in relation to the assistance which we are able to supply to your company."

The so-called "Oil Bill" was enacted in the latter part of July, 1957. It pertinently provided that the National Iranian Oil Company was authorized to open certain districts for the purposes of petroleum development and to "invite offers to enter into agreement in relation thereto". The "offerors" were required to "specify the amount of cash bonus which they are prepared to pay and the extent of participation which they are prepared to accept". The National Iranian Oil Company was authorized to examine "the proposals received within a maximum period of two months and shall select therefrom any proposal which it considers to be more in conformity with the interests of the country with due regard to all relevant factors. * * * The submission of a proposal shall not create any right for the offeror, the National Iranian Oil Company being free to accept or reject all or some of the proposals received."

In late March, 1958, Pan American did submit an offer providing basically for a bonus of $25 million, with a 50%–50% Working Interest to Pan American and NIOC, and subject, of course, to the 50% Iranian income tax laws. Pan American's bid was accepted in April of 1958 and approved by an Act of the Iranian Parliament and Royal Decree on June 5, 1958.

In order to prevail on the asserted oral contract the appellants deny, as indeed they must, the validity of the April written agreement. For the purposes of the oral contract theory, the letter agreement is said to be ineffectual for want of consideration. The argument is to the effect that the letter agreement was intended to be the embodiment of the antecedent oral contract, and since the oral contract contained no provisions whatsoever with respect to competitive bidding, the inclusion of that provision in the letter agreement amounted to a diminution of appellants' rights under the oral agreement and must, therefore, be supported by additional consideration.

If the letter agreement contained material modifications of a pre-existing agreement to the detriment of the appellants, it must be supported by additional consideration. But, if the written agreement was but a mere integration of prior negotiations, it is the embodiment of the agreement of the parties and, being bilateral in the obligations it imposes, is undoubtedly a valid contract. See Corbin, Contracts § 30; 17 Am.Jur. § 469; Cf. Byers Transp. Co. v. Fourth Nat. Bank & Trust Co., Wichita, 10 Cir., 333 F.2d 822; Robberson Steel Co. v. Harrell, 10 Cir., 177 F.2d 12.

The trial court did not reach the consideration issue, first, because apparently the matter was not raised, and more importantly here, the court was of the view that the contractual relationship was between Pan American and Cuban American on one hand and Cuban American and appellants on the other, i. e. Pan American's obligation ran to Cuban American and not to the appellants; and because "the alleged oral agreement * * * was merged into and superseded" by the April 5 letter agreement. The court cited 15 O.S. § 137 which provides, "The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or

stipulations concerning its matter, which preceded or accompanied the execution of the instrument."

■ We agree with the trial court's careful analysis of the contractual relationship of the parties. Despite Riahi's testimony concerning an oral agreement with Pan American, it is manifestly plain that any such agreement was between Pan American and Cuban American. Appellants' interest in such agreement was evidenced by a confirmatory letter dated April 9, 1957, from Cuban American to Riahi and Wagner, "regarding participation in commissions and/or carried interests that result from any deals concluded with the Government of Iran for the development of some of their undeveloped oil and gas lands or tidelands by individuals or companies which we introduce. 1. We are to divide all commissions and/or carried interests equally. You and your associates are to receive one-half and Cuban American Oil Company is to receive one-half. For example, if we work out an agreement for a 25% participation interest with the National Iranian Oil Company in Iran for the Standard Oil Company of Indiana (Pan American Petroleum Corporation) with an arrangement to pay the Government of Iran 50% of the net operating profits in the form of royalties and income taxes, this would leave Standard Oil Company of Indiana (Pan American Petroleum Corporation) 37.5 of the net operating profits. With a 10% carried interest to be split equally between you and us, this will give 1.875% of the net interest to you and your associates and 1.875% of the net interest to us. Standard Oil Company of Indiana (Pan American Petroleum Corporation) would retain 33.75% of the net profit interest." Hillyer conceded the controlling effect of this agreement.[1]

Pan American admittedly knew of the appellants' interest in the Pan American-Cuban American agreement and that they were to share in the benefits to accrue to Cuban American through its effectuation. But, appellants' enforceable interest therein was to be sure governed by its terms and conditions. The written testimonial leaves no doubt of the agreement, the parties to it, and the ob-

---

1. Cross-examination of Mr. Hillyer concerning the Cuban American letter confirms the trial court's analysis of the relationships between Pan American-Cuban American and appellants:

"Q. Well, I want you to look at this letter of April 9th, please, sir.
A. Yes, sir, I've read it.
\* \* \* \* \*
Q. Now, then, I draw your attention to the first paragraph of that contract. Now, after reading that, do you not agree with me that under the contract of April 9th, Cuban American was to divide any commissions that it got from Pan American Oil Company with you? That's right, isn't it?
A. Well, you know, this happened quite a few years ago.
Q. Well the writing itself provides that, doesn't it?
\* \* \* \* \*
A. It seems to indicate that, yes.
Q. Now, then, you have told the Court that you made your arrangement directly with Pan American Petroleum Corporation through Mr. Solliday?
A. Well, that was—my understanding, as I recall—

Q. Well, that's your understanding, you say?
A. Yes, sir.
Q. Well, from this April the 9th letter, your contract between you and Cuban American, you know Pan American has made a deal with Cuban American, don't you, for a commission?
A. Yes, sir.
Q. And you know it was agreed that Cuban American, out of that commission it got from Pan American, was to pay you, don't you?
A. Yes, sir.
Q. Now, do you tell the Court that you had a contract for commission from Cuban American Oil Company and also one from Pan American Petroleum Corporation?
A. No, sir; but, as I recall the conversation, there was something said to the effect that ten per cent was going to be given to Cuban American; and Tevis said something to Solliday that five per cent of this is going to go to Hillyer and Riahi and five per cent is going to go to Cuban American, to which Mr. Solliday agreed to that."

ligations it imposed. The desire of appellants and the intention of the parties to integrate the Pan American-Cuban American Agreement into the written letter of April 5 is unmistakably plain. It was written by Pan American at the insistence of the appellants to specifically articulate their interest in the contractual scheme and give them something to exhibit to their associates in furtherance of their efforts to assist in the negotiation of the oil development contract amenable to the Pan American-Cuban American agreement. We agree with the trial court that the letter agreement of April 5 was valid and governed the rights and liabilities of the parties.

This brings us to a construction of that agreement and particularly to that provision which specifically provides that Pan American "shall have no obligation to you or Cuban American Oil Company under this proposal in the event areas are offered for competitive bids by the Iranian government and are so acquired by Pan American Petroleum Company."

It is noteworthy that during all of this time it was generally known that the government of Iran was seriously considering legislation which would require all oil development contracts to be awarded on a basis other than by private negotiation. Pan American's written commitment to Riahi and Hillyer was undoubtedly made in contemplation of the enactment of such legislation. And, Pan American has contended throughout this controversy that its obligations under the letter agreement were conditioned upon the negotiation of an oil development contract with the Iranian officials, and upon the passage of the oil legislation providing for the award of the contracts on competitive offers, the commitments under the letter agreement were rendered ineffectual and inoperative.

Appellants would construe the competitive bidding provision in the letter agreement in the context of the oil legislation as meaning something quite different from "competitive bidding" for the award of conventional public contracts. They point to the legislative authority of the NIOC to "negotiate with any person * * * whose technical and financial competency has been established and may conclude with such person any agreement which it deems appropriate, on the basis of the terms and stipulations of this Act and other conditions not inconsistent with the laws of the country"; and argue that the granting of the oil development contracts under this broad legislative authority is not a matter of the highest and best bid, but involves the combined discretion of the NIOC, the Iranian Parliament and the Shah. Finally, it is suggested that unlike competitive bidding upon the "identical undertaking" under Oklahoma law (See Flynn Construction Co. v. Leininger, 125 Okl. 197, 257 P. 374, 378), the bids or offers in this case were not upon identical undertakings but upon different sub-areas within the same area and even upon different sizes of tracts of land; that the bids were not comparable and the awards consequently rested largely within the political discretion of the responsible Iranian officials. They say that in any event the competitive bidding provision in the contract is ambiguous when construed in the light of the Petroleum Act, and being in the words of Pan American, any ambiguity must be construed in favor of the appellants to envisage and embrace the oil development contract ultimately awarded to Pan American under the provisions of the Petroleum Act.

■ The Petroleum Act did not use the term "competitive bidding", and it seems fair to say that the authority under the Iranian Petroleum Act to "invite offers" which the NIOC was free to accept or reject is not "competitive bidding" as we ordinarily understand and use that term in the administration of public affairs.

■ Appellants were to be sure entitled to the full benefits of their bargain as judged by the manifest intent of the parties, and the letter contract should be construed in the light of the duties of good faith performance. See Line Driv-

ers Local No. 961 of Int. Bro. of Team., etc. v. W. J. Digby, Inc., 10 Cir., 341 F. 2d 1016, citing Ryder Truck Rental, Inc. v. Central Packing Co., 10 Cir., 341 F.2d 321. We will accordingly judge the whole of the letter agreement in the context it was written and was to be performed, giving consideration to the understanding of the parties at the time it was made as evidenced by their conduct in relation to it.

The appellants were certainly not unaware of the critical significance of the competitive bidding clause of the letter agreement in the face of the impending Petroleum Act. As we have seen, the covering letter of acceptance recognized the effect of the passage of a law "inviting bids" and stated "If the competitive bidding procedure becomes necessary then we trust to your fairness to see that Cuban American Oil Company and we are compensated in relation to the assistance which we are able to supply to your company."

Upon the passage of the Petroleum Act in July, 1957, the appellants became apprehensive lest the Act rendered their letter agreement ambiguous, if not inoperative. Soon after its passage, Hillyer expressed his concern over the bidding provision of the agreement in a letter to Morrow.[2]

Riahi sought out Solliday in Rome, Italy, to persuade him that while the Petroleum Act did not contemplate competitive bidding, the contract might nevertheless "create some trouble between us, and I would like to correct it". Riahi explained to Solliday that he was to give "a part of my compensation away to my associates who are not directly associated with me but who are giving me a lot of help and with whom I have to divide my commission". He went on to explain the importance of modifying the letter agreement to provide for separate agreements with him and Hillyer. The stated purpose of this modification was to provide 4% to Riahi and 1% to Hillyer so he could divide his share with his associates, leaving him and Hillyer a net of 1% each of the net profits provided under the April 5 letter agreement. His testimony is to the effect that Solliday agreed to the modification and clarification subject to Hillyer's approval, but was too busy to prepare letters of agreement and left it to him to do so.

Before they parted in Paris, Riahi gave Solliday a longhand draft of a memorandum. This unsigned and un-

2. August 14, 1957, after the passage of the Petroleum Act, Hillyer wrote Morrow of Cuban American concerning an "Italian deal" apparently privately negotiated between an Italian government agency and the NIOC. The letter states that both the Shah and NIOC "are favorable to giving Sol [Solliday] a deal over here", and the Shah will "see to it that Sol gets the areas he wants, as long as he conforms to the Oil Law, irregardless of competition or competitive 'bidding'. His Majesty told me that he will select the winner of each area, once everyone has presented their offers for each area.

"As you can see, the question of 'bidding' over here on these areas is misleading because these are not true bids in the correct sense of the word. But it is an unfortunate development that recently occurred, because it was only attached to and became part of the new Oil Law at the last minute.

\*   \*   \*   \*   \*

"But after Sol's departure, the important figures working with Manuchehr and myself have pointed out that Sol can claim, after a deal is made, that the 'bidding' clause of our agreement with him relieves his company of any responsibility to all of us. This point has been discussed in certain high quarters which I cannot mention in this letter, but of which you are aware. Therefore, it has been suggested to us that Sol is now set up for a deal and can secure quick approval, like the Italians, but we must first secure written understanding from him to the effect that the term is used loosely and in actuality the deal was made through private negotiation and not through an actual sealed, competitive bid presented in the manner done in the United States on such deals. Entezam is ready to arrange for Sol's crews to come over carte blance. He is also ready to invite Cuban American to come also. Let me know your thoughts on the above as soon as possible. \*   \*   \*"

dated memorandum, written on Paris Hotel stationery, was intended to embody the substance of their clarifying agreement. It is apparently in the form of a suggested letter which Solliday would write to Hillyer setting forth the terms of the clarifying agreement which Solliday and Riahi had reached as a result of their discussions in Rome and Paris. The memorandum referred to the letter agreement of April 5, 1957, and stated its substance. It then stated "since now matters have changed and according to the Iranian Oil Law * * * PAPC has no more any obligation to you" under the letter agreement. "But studying the matter again with Mr. M. Riahi, we think that you can still be helpful in our obtaining oil and gas contracts in Iran. We are, therefore, willing to give you now a commission equal to 1% of our net operating profits in any oil and gas deal under any term we may make in Iran. This undertaking become valid only when you give us your approval as to cancellation of our agreement dated April 5, 1957. We are entering into a separate and similar understanding with Mr. M. Riahi and appreciate your further collaboration with him."

As a result of the Solliday-Riahi visits in Rome and Paris and consistently with the memorandum, Hillyer and Wagner wrote Solliday on December 23, making reference to the April 5 letter agreement and reciting that "Due to the fact that this letter agreement was made before the Iranian Petroleum Act of July 1957 and was subject to some special terms which today are presumably not valid, Mr. Riahi thereupon met with you in Rome * * * and discussed this agreement with you as it then existed. Based upon this discussion Mr. Riahi believes to have your accordance for compensation of all the services rendered and for services that will be rendered in future * * * on any contract that you sign with the Iranian Gov't. and/or NIOC. In other words, you would pay 1% to Riahi and 1% to Hillyer-Wagner, a total of 2% of your company's share in

any Iranian venture." The letter went on to recite "If Mr. Riahi's impression is correct, we agree to cancel the Agreement of April 5, 1957, and replace same by two entirely separate agreements, one in the name of Mr. Riahi, and the other in the names of Mr. Hillyer and Mr. Wagner." Contemporaneously with this letter and in the same tenor, Riahi wrote Solliday also making reference to the April 5 letter agreement for 5% of the net profits with a net of 1% to Riahi and Hillyer respectively. The letter then specifically and significantly states that the letter agreement of April 5 "was given to us before the Petroleum Act of July, 1957, and the specific terms contained therein did not agree to the Petroleum Act. This made the letter of agreement somehow of little value." The letter went on to express appreciation for "the attitude that you have taken in solving the two major problems and your acceptance of the following: (a) To rectify your agreement of April 5th 1957 and accepting to carry us with 5% from your Net Profit on any kind of agreement and deal on any terms which you are going to agree upon in Iran on Iranian Oil." Wagner also wrote a letter giving "my written consent to this revision."

When these letters reached Solliday's office in Tulsa, Oklahoma, he was apparently out of the country. About thirty days later Solliday wrote separate but similar letters to Riahi and Hillyer. In his letter to Riahi he acknowledged Riahi's letter and also the one from Hillyer and Wagner "wherein they recognize that the understanding and agreement of April 5, 1957, between myself and you and Mr. Wagner in regard to our payment of a commission if we should acquire oil and gas interests in Iran, would no longer apply or be valid". His letter went on to state that he did not know whether "we will bid in Iran at all, but the situation has considerably changed since my discussion with you in Rome"; that all negotiations in the future would be handled through Mr. Dohm, the president of a newly organized subsidiary

622

with offices in New York; that Mr. Dohm was of the opinion that all negotiations in Iran would be handled through the NIOC and any concessions would be awarded to the highest bidder. The letter closed by stating that "If we decide to submit bids in Iran, I will arrange for Mr. Dohm or some of his associates to contact you. I feel if any commission should be warranted, it will have to be based on the assistance you give us in any specific bid, and the amount will likewise have to be determined at that time." In his separate letter to Hillyer reference was again made to the April 5 letter agreement and too of his discussion with Mr. Riahi in Rome; that Riahi had agreed that "the letter of April 5, 1957 would preclude any of you from getting a commission, due to the last part of the second paragraph on page 2" relating to competitive bidding. Reference was then made to the proposed clarifying agreement as contained in the previous letters from appellants. In that regard Solliday stated "Since my conference with Mr. Riahi, conditions have changed considerably, and I have written him in detail in a letter dated January 30" informing him of the new subsidiary with offices in New York under the active management of Mr. Dohm who "is definitely of the opinion all negotiations in Iran in the future will have to be handled through NIOC, and contracts for oil operations in Iran will be awarded to the highest bidder unless for some reason the company is not acceptable". He expressed doubt of whether the company would submit bids, but in the event they did Mr. Dohm or one of his associates would contact Mr. Riahi "and discuss the situation at that time".

■ Though the appellants asserted and relied on the clarifying oral agreement between Solliday and Riahi arrived at in Rome and Paris substantially in accordance with the memorandum and ensuing letters, the trial court was of the view that Solliday never assented to the requested changes in the April 5 letter agreement, and no contract result-

ed "leaving in effect for whatever it was worth the April 5 letter agreement". We do not understand that the appellants now contend for an oral contract cancelling, superseding or modifying the letter agreement. In any event we agree with the trial court that no such agreement was ever consummated.

Appellants do earnestly contend, however, that this correspondence and the negotiations prove ambiguity justifying a construction to cover the contract ultimately awarded to Pan American pursuant to offers submitted under the oil legislation.

Corollary to the ambiguity plea is the contention that Pan American is estopped to deny ambiguity or applicability of the letter agreement to the development contract. It is suggested that Solliday remained deliberately and deceptively silent when he was under a duty to speak concerning Pan American's interpretation of the letter agreement; that Solliday entertained Riahi's persistent overtures for a clarifying and modifying agreement and expressed a willingness to consider such an agreement in accordance with the Paris memorandum. Meanwhile, Solliday is said to have been advantageously utilizing the appellants' good offices in furtherance of Pan American's quest for an oil development contract in Iran.

■■ It is, of course, perfectly true that Pan American could have by its silence and conduct led the appellants to believe that all of their efforts in behalf of Pan American before and after passage of the Petroleum Act were done and performed under color of the letter agreement and that such agreement contemplated and included a development contract effected under the provisions of the Act. For, it is settled that "representation or concealment may arise from silence of a party under a duty to speak, and the intention that the representation or concealment be acted upon may be inferred from the circumstances. * * Estoppel may also be effectuated where

a party does or omits to do something which he intends or should reasonably expect to influence the action of the other party, and the other party relies and acts thereon to his prejudice." See Liberty Nat. B. & T. Co. v. Bank of America Nat. T. & S. Ass'n, 10 Cir., 218 F.2d 831; Gamble v. Cornell Oil Company, 10 Cir., 260 F.2d 860.

■ In the first place the contract itself draws its own clear distinction between a negotiated contract and one awarded pursuant to "competitive bids". As we have seen, the letter agreement specifically provides that Pan American's obligation to appellants is conditioned upon the negotiation of a contract and is to be inoperative and ineffectual in the event a contract was secured through competitive bids. In the second place if the language leaves any room whatsoever for ambiguity, it was made manifestly clear by the conduct and correspondence of the parties subsequent to the passage of the Act. Appellants' efforts to modify it is irrefutable evidence of their utter lack of confidence in it or reliance upon it to cover any contract awarded pursuant to the Act.

■ Nor can we find anything in the record to support the appellants' claim of estoppel. After the Solliday-Riahi meetings in Rome and Paris in November following enactment of the oil legislation in July, Riahi and Hillyer sent their suggested form for the modifying agreement in the latter part of December. Solliday replied in clear and unequivocal language about thirty days later. Those letters left no doubt of Pan American's attitude toward the letter agreement or its obligation to the appellants thereunder.

Subsequent to the passage of the oil act, the appellants did continue to perform services for Pan American in furtherance of its interests in Iran. But, it is perfectly plain from what we have seen that they did so not on the assumption that their letter agreement covered a development contract acquired under authority of the oil legislation, but in the belief that a contract might still be negotiated notwithstanding the intervening legislation.

■ The trial court found that Pan American's bid or offer was submitted pursuant to the provisions of the oil act and "was accepted solely upon its merits and the advantages to the Nation of Iran"; that appellants "were in no way instrumental in securing the oil concession * * * and their services were performed under the written agreement of April 5 which provided they would be entitled to compensation only if a negotiated concession was obtained on the terms therein set forth". We agree, and this being true, there are no grounds for recovery as and for quantum meruit, for there can be no recovery in quantum meruit for services performed under and pursuant to a valid and express contract. See Carpenter v. Josey Oil Company, 8 Cir., 26 F.2d 442; Federal Royalty Company v. Knox and Others, 5 Cir., 114 F.2d 78.

■ In summary we hold that the letter agreement of April 5 was valid and governed the rights and liabilities of the parties; that the services performed by appellants in behalf of Pan American were in furtherance of the objectives of that contract; the parties failed to achieve the objectives of the agreement and the venture failed and with its failure Pan American had no obligation thereunder.

Judgment is affirmed.