LINE DRIVERS LOCAL NO. 961 OF the INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Appellant,

v.

W. J. DIGBY, INC., Appellee.

No. 7661.

United States Court of Appeals
Tenth Circuit.

March 1, 1965.

11. This disposition renders unnecessary determination of infringement issues.

John A. Criswell, Englewood, Colo., for appellant.

Albert B. Dawkins, Denver, Colo., for appellee.

Before MURRAH, Chief Judge and PICKETT and SETH, Circuit Judges.

MURRAH, Chief Judge.

This is an appeal by the appellant-Union from a judgment in a suit under Section 301(a) of the Labor Management Act of 1947, 61 Stat. 156, 29 U.S. C.A. § 185, to declare and enforce a labor contract. The validity of the contract sued on is not now in dispute. The appeal is premised on the Union's contention that the trial court too narrowly interpreted its scope and effectiveness and unduly restricted equitable relief accordingly.

The parties seem to agree that a sense of the history of this litigation is essential to a proper understanding of the precise question for decision. But the briefing seems designed more to confound than to simplify and clarify our problem. The case was tried in two stages before two different judges. The last judge adopted the findings of the first judge and those findings are not now in dispute. We will therefore follow the findings of the trial court to the critical point of this appeal.

According to the findings of the trial court, appellee-Digby was first engaged in hauling "exempt" commodities, i. e., those not requiring an I.C.C. permit. During that period, its over-the-road employees were represented by the appellant Local Union under a collective bargaining contract known as the "Old Perishable Foods Contract." This contract was between Union and several carriers of perishable food in the State of Colorado known as the "Perishable Freight Transfer Group." In December 1957, before the labor contract was to expire in November 1958, Digby obtained an I.C.C. permit to transport "general commodities" to points in Colorado. However, the parties apparently continued to operate under the "Old Perishable Foods Contract."

At the same time the appellant-Union also represented the over-the-road employees of other carriers under a multi-Union, multi-employer "dry freight" collective bargaining contract.[1] A labor dispute arose over negotiations for a new "dry freight" contract resulting in a lockout in August 1958 by most of these carriers. Digby was not a party to this labor contract or to the dispute.

As a result of this lockout quantities of freight accumulated in Denver for transportation west. To take advantage of this situation, Digby's President inquired of the appellant-Union's President whether it would be subjected to economic reprisals if it undertook to transport the accumulated "dry freight" under a temporary I.C.C. permit. Upon being assured that it would not, Digby obtained the temporary permit and proceeded to haul "dry freight" under an informal agreement with the Union to abide the provisions of the disputed "dry freight" labor contract.

Meanwhile, all members of the "Perishable Freight Transfer Group" except Digby were negotiating a "New Master Perishable Foods Contract" with the appellant Union to succeed the expiring "Old Perishable Foods Contract." A new contract was negotiated and a "Memorandum of Agreement" signed March 21, 1959. This memorandum was later incorporated into the "New Master Perishable Foods Contract" signed in June 1959, effective from November 1, 1958 to April 1, 1962. After some labor difficulty, Digby signed the memorandum and the subsequent Master Agreement. On the date Digby signed the Memorandum of Agreement, it also entered into

1. The terms "perishable commodities" and "dry freight" have a well defined meaning in the transportation industry and are generally used to identify the particular freight or commodity to which the terms are obviously applicable.

a separate "Letter of Understanding" with the Union which recited that Digby was engaged in "dry freight" operations as well as "perishable commodities", but that "dry freight" transportation was a minor part of his total operation. It was therein agreed that whenever Digby's equipment was engaged in transportation of "dry freight", the drivers would be paid in accordance with the wage scale established in the multi-Union, multi-employer "dry freight" agreement negotiated in November 1958 after the August lockout effective May 1, 1958.

It thus appears that from November 1, 1958 to April 1, 1962, the appellant-Union and Digby operated under at least two different types of labor contracts, one pertaining to transportation of "perishable commodities", the other the transportation of "dry freight". It also appears that Digby was the only employer on this scene engaged in these dual operations under two separate labor contracts with the same union representing the same employees.

Before the expiration of the "dry freight" agreement in July 1961, negotiations began for a new contract. The coexistent "Letter of Understanding" which bound Digby to the expiring "dry freight" contract was also coming to an end. Apparently in order to maintain effective labor relations, the parties on June 30, 1961 entered into a simple agreement which is the subject of this complicated lawsuit. The agreement recited that Digby would be bound by all of the terms and provisions of the Master Agreement as supplemented "applicable to the Employer's operations"; and that Digby would "execute an agreement containing all the terms and conditions of the * * * Master Freight Agreement and any and all supplemental agreements thereto applicable to the Employer's operation." It is noteworthy that at this time the parties were also operating under the Master Perishable Foods Contract which did not expire until almost a year later—April 1, 1962.

The new Master Agreement and its supplement were negotiated and became effective on the expiration of the previous "dry freight" contract—July 1, 1961. Digby was then asked to sign a labor contract in conformity with the New Master "Dry Freight" Contract, as supplemented, covering his operation. Digby refused to sign, contending that all of his driver-employees had become partners in the enterprise and subcontractors of the equipment, consequently there were no employees for the appellant-Union to represent. This suit was then commenced to compel execution of the labor contract, to hold Digby in breach of the same, and to prohibit it from contracting out the work which was to be performed by the bargaining unit. On the first stage of the trial, the court sustained the validity of the agreement between the parties to execute a contract in conformity with the Master Agreement, as supplemented; and by agreement of the parties it reserved for further trial and decision (a) the effective date of the contract, (b) its status and effect on Digby's operations, and (c) whether Digby had breached the contract as declared, if so, the equitable relief to be granted.

On the second stage of the proceedings, the second judge stood on the findings and conclusions of the first judge and proceeded to take testimony and determine the submitted issues. The trial court recognized that the "Letter of Understanding" and the subsequent agreement now in suit, both of which bound Digby to the succeeding Master Freight Agreements, were concerned exclusively with Digby's "dry freight" operations.

Based upon all the findings, the court then found that Digby's "perishable food" agreement had expired by its terms on April 1, 1962, and that no further labor agreement existed between the parties concerning the transportation of perishable foods. The trial court proceeded to interpret the term "perishable food" in the expired contract to include "any

commodities the transportation of which required protection of heat or cold;" and found that the parties intended the term "dry freight" to "include all other commodities * * * other than those encompassed within the court's definition of perishable foods." The court accordingly interpreted the existing "dry freight" contract as applicable to Digby's transportation of commodities not requiring "protection from heat or cold." As thus interpreted, Digby was permanently enjoined from hauling any "dry freight" except in compliance with the requirements of the Master "Dry Freight" Agreement, as supplemented. Therein lies the nub of the lawsuit as it comes to us.

Simply put, the Union's contention is that as a matter of law, the so-called "dry freight" agreement was intended "to apply to the transportation of all commodities, when such transportation * * * [is] pursuant to authority granted by the Interstate Commerce Commission, i. e., that it was meant to be applicable to all 'regulated' operations of the Company." In other words, the Union contends that on the expiration of the "Perishable Foods Contract" in April 1962, all labor relations incident to Digby's operations became integrated in the Master "Dry Freight" Contract, as supplemented. It simply says that the Master "Dry Freight" Contract was designed to achieve peaceful labor relations between all the signatories; and being necessarily general in scope, it left much to judicial improvisation. The uniqueness of this theory in conventional contract law is candidly conceded, but is said to be entirely consonant with the assigned role of the courts in the construction and enforcement of collective bargaining contracts under Section 301.

 In the interpretation of commercial contracts we have recently reemphasized the duty of "good faith" performance and the "Court's duty to construe [the contract] so as to effectuate the manifest intention of the parties—

to give life and vitality to the language the parties have used to express their agreement." Ryder Truck Rental, Inc. v. Central Packing Co., Inc., 10 CA, 341 F.2d 321. We know that collective bargaining agreements are more than just a contract. " * * * it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 578, 80 S.Ct. 1347, 1351, 4 L.Ed.2d 1409; that in developing "a meaningful body of law to govern the interpretation and enforcement of collective bargaining agreements * * * special heed should be given to the context in which collective bargaining agreements are negotiated and the purpose which they are intended to serve." United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 567, 80 S.Ct. 1343, 1346, 1363, 4 L.Ed.2d 1403.

 Applying these canons of construction, we will of course give effect to the generalized design of the labor contract, making sure that neither party is permitted to interfere with the right of the other to the fruits of his bargain. The Master "Dry Freight" Agreement was undoubtedly designed to achieve peaceful labor relations among the segment of the transportation industry to which it was generally applicable. The Master Contract, however, clearly contemplated supplementation to cover operations not specifically articulated in the Master Contract. The supplemental agreement which the court made applicable, and which the Union seeks to enforce, provides that it "shall cover all over-the-road operations." But the next section specifically recites that "For purpose of this Agreement, the term 'over-the-road operations' is any dry freight operation * * *." This language leaves no room for improvisation, and moreover, is entirely consonant with the background labor relations of the parties. The trial court's interpretation is clearly correct and its judgment is affirmed.