William M. ARNOLD et al.

v.

The GREAT ATLANTIC & PACIFIC TEA CO., INC. and Warehouse Employees Union, Local 169.

Civ. A. No. 77–2221.

United States District Court,
E. D. Pennsylvania.

Nov. 21, 1980.

Mead Spurio, Philadelphia, Pa., for plaintiffs.

Warren Borish, Philadelphia, Pa., for Local 169.

John Unkovic, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for A & P.

## MEMORANDUM AND ORDER

NEWCOMER, District Judge.

Sixteen named plaintiffs bring this action under § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), alleging a breach of the duty of fair representation by their union, defendant Warehouse Employee Union Local 169 ("Local 169"), and a breach of a collective bargaining agreement by defendant Atlantic and Pacific Tea Company ("A & P"). The salient facts of this case are set out at D.C., 461 F.Supp. 425.

Plaintiffs' case was heard in April, 1980. Subsequently, the defendants moved for dismissal contending, inter alia, that the plaintiffs had failed to exhaust certain intra-union appeal procedures. On September 3, 1980, this Court denied the motion finding that further recourse to intra-union appeal mechanisms would be futile. Defendant's case was then presented in September, 1980.

Having now considered all evidence presented by plaintiffs and defendants, the Court is prepared to rule on the claims presented in this case.

I. *Findings of Fact*

1. Marshall James started work in 1964 at the Yeadon produce facility. In 1973, he went to the perishables facility in Florence, New Jersey. He was laid off in 1975 and called back in November, 1976.

2. William Kirby started work at the Yeadon produce facility in May, 1960. In 1975, he was laid off due to the clerk's strike. He received a letter stating that he should report back to work at the Florence perishables facility and he did so. Two or three months later he was laid off. During 1975–77, he worked as a part-time employee.

3. William Daley, Jr., started work at the Yeadon produce facility in 1964. He was transferred to groceries for two days during 1972 and then returned to produce for eight or nine months. He went back to groceries "at the bottom of the list" and was subsequently laid off. In 1973, he returned to perishables in Florence. After a matter of months, he was once again laid off. After a short return to the grocery facility, he was transferred back to the Florence perishables facility. He worked there until 1975 when he was laid off.

4. Edward Manahan started work in 1965 at the Yeadon produce facility. He worked in groceries for a short time and then returned to produce. He was laid off in 1975.

5. Alexander Johnson started working at the Yeadon produce facilities. After September, 1973, he went to the Florence perishables facility. He was laid off in February, 1975.

6. Robert Rinick started work in 1964 at the Yeadon produce facility. He worked at the Florence perishables facility from April, 1973 until his layoff in February, 1975.

7. Walter S. Lewis started work in 1965 at the Yeadon produce facility. After a very short time in groceries he went to work at the Florence perishables facility until he was laid off in 1975.

8. Joseph Sceon started work at the Yeadon produce facility in 1964. In 1973, he went to the Florence perishables facility. In 1974, he was laid off for three or four months and then called back as a casual. In 1975, he was laid off but did not return when called back to work.

9. William A. David, Jr. started work in 1960 at the Yeadon produce facility. He was laid off in 1975 and then went to work at the Florence perishable facility.

10. Gary Brown started worked at the Yeadon produce facility and was laid off in September, 1971.

11. Carl Green started work at the Yeadon produce facility in 1964. In 1973, he was transferred to the Florence perishables facility and worked there until being laid off in 1975. He resumed his full time status in 1978. In July, 1979, he volunteered to go to the Yeadon produce facility.

12. Joseph Scull started work at the Yeadon produce facility in 1956. In 1973, he went to the Florence perishable facility and was laid off in 1975. Presently, he is employed as a casual at the Florence facility.

13. James J. Carson, Sr. started work at the Yeadon produce facility in 1964. In 1973, he spent one day in groceries. He went to the Florence perishables facility in 1973 and was laid off in 1975.

14. William M. Arnold started work in 1954 at the Van Pelt and Oregon Avenue plant as a produce man. He worked there until the company moved its facilities to Yeadon. He then worked at the Yeadon produce facility until 1971 (with the exception of a two year job for Murphy Motor Freight). In 1971, he went to groceries due to a layoff in produce. He worked in groceries for four or five days and then returned to produce for six or eight months. He returned to grocery for two or three months and then returned to produce. He was then sent to the Florence perishables facilities and his job was terminated in February, 1975.

15. Larry Felton started work in 1972 at the Yeadon produce facility as a casual. During this time he worked in grocery for four or five months as a casual. He was laid off in 1974.

16. Francis Schmitt started work as a casual in 1972 at the Yeadon produce facility. In September, 1973, he went to grocery and worked as a casual for six months. Subsequently, he became a supervisor and was laid off in May, 1976.

17. At all relevant times A & P operated three food handling facilities in the Philadelphia area: a produce facility in Yeadon, Pennsylvania, a grocery facility in Yeadon, and a produce facility in Florence, New Jersey. Each of these facilities maintained separate seniority lists. For some men, two dates were kept as record. One was "company" time, the other "warehouse" time.

18. Schedule F of the employment contract negotiated by Local 169 and ratified by its members reads in relevant part:

No casuals will be hired under the terms of Section 5, paragraph d [procedure for hiring casuals] while regular employees are on layoff status.

19. Section 5(d) of the contract first appeared in the 1971 agreement between Local 169 and the employer group to which A & P belonged. It was inserted into the agreement in order to regulate employers' use of casual workers. As of 1971 absenteeism at certain facilities reached 22% and the employers insisted that the use of casual workers was imperative. Before 1971 the use of casuals was unlimited. By virtue of Section 5(d) the use of casuals was approved by the union, but on the limited basis of one casual for every one absent regular worker.

20. Between 1971 and 1974 several companies violated Section 5 by employing more than the permissible number of casuals. Schedule F was drafted by Local 169 business agent Ralph Edmunds. It was inserted into the contract in 1974 to prevent employers from redesignating regular workers as casuals and to keep employers from hiring casuals while regular workers were on layoff.

21. In order to police employer conduct, seniority lists for both regular workers and casuals were kept in each facility. After 30 days of work a casual became a member of the union. After 90 days of work a casual was entered on the casuals seniority list. If any casual worked for 1500 hours within one year after the 90 day period elapsed, he became a regular employee, and was entered on the regular employee seniority list. This new procedure represented the first time casuals were given seniority rights.

22. Business agent Edmunds received a grievance signed by plaintiff Arnold dated October 12, 1973. Edmunds received other grievances from plaintiffs regarding the separate seniority lists. Edmunds discussed the grievances with Bernard Katz, counsel to Local 169. Katz confirmed Edmunds's understanding that Schedule F anticipated that each facility would maintain separate seniority lists, and that Schedule F did not allow employees to carry "warehouse" se-

niority from one facility to the next. Katz advised Edmunds that the grievances would not be sustained by a board of arbitration, because the union could not achieve through arbitration what was not achieved in negotiations.

23. Edmunds did not notify grieving plaintiffs that their grievances would not be acted upon.

24. At various times casuals were employed at the grocery facility in Yeadon while regular men were laid off from produce facilities.

## II. *Conclusions of Law*

Both the claim of breach of contract against A & P and the claim of breach of the duty of fair representation are based on the meaning of Schedule F. If Schedule F means what Local 169 and A & P say it means, then defendants must prevail; A & P did not breach its contract with plaintiffs and the union did not fail to represent them fairly. If A & P was not obligated to hire plaintiffs before the casuals employed at the grocery facility, then its failure to do so cannot be a breach of contract. Similarly, if the rights demanded by plaintiffs were not guaranteed by the contract, then the union's failure to press grievances alleging a violation of those rights cannot be a breach of the duty of fair representation. *Vaca v. Sipes*, 386 U.S. 171, 191, 87 S.Ct. 903, 917, 17 L.Ed.2d 842 (1967).

Throughout the course of this trial the Court heard from basically two sources of interpretation: one comprised the authors and parties to the agreement, the other comprised the men who worked under the agreement, and plaintiffs. All of the plaintiffs said that they thought they should be allowed to transfer from one facility to the next, while maintaining their seniority. All of the union and company witnesses who were involved in drafting the agreement testified that separate seniority lists were kept, that this was the choice of the union membership, and that it was the best bargain they could negotiate at the time.

■ It is a well–accepted principle of contract law that the courts will interpret a contract so as to effectuate the intention of the parties. *See generally Line Drivers Local No. 961 of Int'l Bd. of Teamsters v. W. J. Digby, Inc.*, 341 F.2d 1016 (10th Cir. 1965). One of the aids a court uses in the interpretation of a contract is the interpretation which the parties themselves have placed upon it. *See Pittsburgh Die Sinkers Lodge No. 50 v. Pittsburgh Forging Co.*, 255 F.Supp. 142, 146 (W.D.Pa.1966). A court must keep in mind the fundamental contract rule that the intention of the parties governs interpretation of the instrument. *See Communications Workers of America v. Gen. Tel. Co. of Ky.*, 236 F.Supp. 588, 589 (E.D.Ky.1965). Professor Williston summarized the court's role in contract interpretation as follows:

> The primary function of judicial interpretation is to ascertain and give effect to the intention of the parties as expressed in their writing. And the basic rule of universal acceptation for the ascertainment of such intention is for the court, so far as possible, to put itself in the place of the parties when their minds met upon the terms of the agreement, and, taking into consideration the writing itself, its purpose, and the circumstances leading up to and attending its execution, endeavor to ascertain what the parties purposed and intended by their agreement.

4 *Williston on Contracts*, § 607 (3d Ed. 1961). *See also Restatement of Contracts* § 236(a) (1932).

Here we have the unusual situation of the employer and the union, the two contracting parties, agreeing as to how the contract between these two parties should be interpreted. But this interpretation is not the one that satisfies the plaintiffs. In the same type of anomolous situation as the case at hand, one court in interpreting a contract stated:

> [T]he Court [is limited] to the "four corners" of the contract in considering what the intention of the parties was; the cardinal rule in the construction and interpretation of contracts is that effect must be given to the intention of the parties

unless it is inconsistent with some established principle of law; where a contract is plain and unambiguous there is no room for contradiction and it must be presumed that the parties meant what they expressed....

*Ruppert v. Cumberland Brewing Co. v. Allegany County,* 269 Md. 56, 61, 304 A.2d 240, 243 (1973).

It is precisely the "plain meaning of the words" that plaintiffs urge this Court to accept in interpreting Schedule F. However, the parties to the contract have testified that the "plain meaning" asserted by plaintiffs was not the "plain meaning" they intended. The Court must therefore go beyond the four corners of the document.

The court in *Ruppert* did not discuss the degree to which defendants' agreement as to their intentions should be discounted, if at all, because of its self-serving nature. This Court is fully aware of the possibility that Local 169 and A & P know their mutual interest in agreeing about the meaning of Schedule F. Nevertheless, there are sufficient indicia of credibility present here to support the interpretation offered by defendants.

 Plaintiffs urge that a meaning be given to Schedule F that would contradict the previous and continuing practice of A & P and Local 169 in maintaining separate seniority lists. The broad interpretation suggested by plaintiffs would render meaningless the practice, not only of keeping separate seniority lists, but also of keeping records showing both company and warehouse seniority for the workers in the different warehouses. Therefore, even if the Court were inclined to disbelieve defendants' witnesses, which it is not, there is evidence adduced at trial that rebuts the meaning plaintiffs give to Schedule F. Taken together, it is clear that plaintiffs have failed to carry their burden of showing that Schedule F meant that seniority rights were transferrable from facility to facility, or, put differently, that Schedule F was not an intra-warehouse rule.

III.   *Conclusion*

Because plaintiffs have failed to prove that Schedule F applied across all A & P facilities and established transferrable seniority, they have not shown breach of contract by A & P or a failure fairly to represent them on the part of Local 169. Judgment is therefore entered for defendants.