**PHILIP MORRIS INCORPORATED,**
Plaintiff,

v.

**PITTSBURGH PENGUINS, INC. and Civic Arena Corporation, American Sign and Indicator Corporation, Defendants.**

Civ. A. No. 83–1919.

United States District Court,
W. D. Pennsylvania.

Oct. 31, 1983.

tion, restraining and enjoining the Pittsburgh Penguins, Inc. ("Penguins") and the Civic Arena Corporation ("CAC") from interfering with a contract for advertising at the Civic Arena ("Arena") entered into by the plaintiff, Philip Morris Incorporated ("Philip Morris"), and the Penguins, and from interfering with advertising sold or rented to the plaintiff under the aforementioned contract.

An amended complaint was filed by the plaintiff in which American Sign & Indicator Corporation ("AS & I") was joined as a defendant. In this complaint, the plaintiff seeks to restrain and enjoin AS & I from interfering with and conspiring to interfere with plaintiff's rights under the advertising contract.

Subsequent to filing the amended complaint, defendants' counsel sent a letter to plaintiff's counsel, informing them of CAC's intent to install a new scoreboard in the Arena and to replace plaintiff's scoreboard advertising display with the advertisement of another tobacco company. In light of this letter, on September 9, 1983, plaintiff sought a Temporary Restraining Order ("TRO") to enjoin the defendants from altering any of plaintiff's displays at the Arena or installing any new advertisements without plaintiff's approval until this Court rendered a decision as to the complaint. The request was granted.

On October 11, 1983, we conducted a hearing on plaintiff's complaint and Motion for a Preliminary Injunction. At the hearing, defendants objected to equitable relief in the form of an injunction on the grounds that the complaint sounded in contract law and, as such, any possible damages could be measured and enforced in law. Thus, the plaintiff would not be irreparably harmed. We disagreed and held that, if the defendants were to remove and replace any of the plaintiff's advertising displays before this case was adjudicated, irreparable harm would occur. We held that there is no way that monetary damages could be calculated for the loss of prospective customers due to the absence of the plaintiff's signs on the top panels of the scoreboard.

Kenneth Salmon, Charles E. Steele, Joseph A. Katarincic, Pittsburgh, Pa., for plaintiff.

Joseph F. McDonough, Pittsburgh, Pa., for defendants.

## OPINION

COHILL, District Judge.

### I. *Procedural Background*

This case comes before us on a complaint seeking, *inter alia*, a preliminary injunc-

As such, we proceeded in equity and conducted a hearing on the Motion for Preliminary Injunction. Pursuant to Fed.R.Civ.P. 65(a)(2), we consolidated the hearing on the motion with a trial on the merits. At the conclusion of the hearing, we continued the TRO until our opinion was filed.

In accordance with Fed.R.Civ.P. 65(d), we make the following findings:

Plaintiff, Philip Morris Incorporated is a Virginia corporation. Its primary business is manufacturing tobacco products, including such brands of cigarettes as Marlboro, Virginia Slims and Benson & Hedges.

Defendant, Pittsburgh Penguins, Inc., is a Pennsylvania corporation owned by the Edward J. DeBartolo Corporation ("DeBartolo Corporation").[1] The Penguins is a National Hockey League team.

Defendant, Civic Arena Corporation, is also a Pennsylvania corporation owned by the DeBartolo Corporation. CAC was formed in 1981 for the purpose of taking over the operational control of the Arena from the Public Auditorium Authority of Pittsburgh and Allegheny County ("Authority"). The Arena is a large circular facility located in downtown Pittsburgh in which sports events, concerts, conventions and other public activities are held.

Defendant, American Sign & Indicator Corporation, was formed under the laws of the State of Washington. Its business is to manufacture advertising displays, scoreboards and other signs.

## II. *Findings of Fact*

### A. *Advertising Agreement (Authority-Penguins)*

On June 1, 1971, the Authority, which at that time both owned and operated the Arena, entered into a ten-year lease with the Pittsburgh Penguins Partnership, allowing the hockey games to be played at the Arena. The lease specifically forbade the Penguins Partners to advertise at the Arena. In 1975, the partnership went bankrupt.

In July, 1975, Pittsburgh Penguins, Inc. (the present corporation) was formed.[2] It acquired the hockey team and, through assignment, continued under the 1971 lease. However, on October 25, 1976, the Authority entered into a new ten-year lease with the Penguins. It, too, expressly prohibited any Arena advertising by the Penguins.

On November 19, 1976, the Authority entered into a separate advertising agreement ("Agreement") with the Penguins. The Agreement gave the Penguins the right to sell advertising space on the interior of the Arena. The authority given to the Penguins was clearly expressed in paragraph 1 on the Agreement which provides:

> 1. Authority hereby grants to Penguins the right to sell advertising space and to affix advertising panels and equipment at locations on the interior of the Civic Arena approved by the Executive Director of the Authority.

*See*, Plaintiff's Ex. 5.

The Agreement required the Penguins to promptly advise the Authority of any sales made and to furnish the Authority with a contract of such sale. *Id.* at ¶ 7. All advertising was subject to the Authority's approval and any advertisement contract could be rejected by the Authority. *Id.* at ¶ 2. The Agreement was to terminate on May 31, 1978. Since the date of termination, the Penguins have not sold any advertising space in the Arena pursuant to this Agreement.

### B. *Advertising Contract (Philip Morris-Penguins)*

While the Agreement was in effect, James McDonald, Director of Sales and

---

1. The DeBartolo Corporation is a closely held corporation owned by Edward J. DeBartolo, Sr., Edward J. DeBartolo, Jr. and Marie Denise DeBartolo York.

2. Edward J. DeBartolo, Sr. became involved with the Penguins in 1975, after the corporation was formed and the hockey team was acquired from the bankrupt partnership. At that time, he served as a one-third owner/operator. In early 1978, he transferred his interest in the Penguins (which was approximately 96%) to the DeBartolo Corporation.

Advertising for the Penguins, began soliciting prospective advertisers. In a letter dated August 5, 1977, sent to Mr. Vincent Weiner, Director of Special Media for Philip Morris, Mr. McDonald sought Philip Morris as a customer for the scoreboard advertising display areas. After quoting possible prices, Mr. McDonald concluded by stating,

> Vince, if you're interested in the scoreboard, I can tie in season tickets, etc., and a long-term contract.

*See*, Plaintiff's Ex. 2.

After some negotiations between Messrs. McDonald and Weiner, an agreement for advertising was reached. On October 29, 1977, a contract was signed giving Philip Morris, *inter alia*, the exclusive right of tobacco advertising in and around the Arena and first refusal rights on other advertising. Plaintiff's Ex. 3, ¶ 2.2. In addition, the plaintiff was granted the right to display its own advertisements on the four panels on top of the scoreboard. *Id.* at ¶ 1.0. As consideration for these rights, plaintiff agreed to pay $13,500.00 per year.

The running of the contract was to commence on the date the display panels were installed on the scoreboard and "shall continue for a period of *ten (10)* years..." *Id.* at ¶ 4.1. The panels were installed in 1977, therefore, the contract terms provide for a 1987 termination date.

A standard advertising form contract was used in which the specifics were supplied by the parties in the blank spaces provided. The form contract remained intact except for a few changes. Since the Penguins did not own the Arena (as most sellers of advertising space do), the language dealing with the operator's ownership was stricken. Also removed were the paragraphs which provided for a pro rata refund to the advertiser in the event the contract was terminated after the Operator paid in advance. In their place, paragraph

6.2(a) was added which provides that, if the Penguins do not have the exclusive right to sell space, then the Agreement may be terminated by Philip Morris. The defendants argue that this paragraph, inserted at the request of plaintiff, shows that Philip Morris knew the Penguins' rights were limited. In interpreting this paragraph, we find that the plaintiff was merely protecting itself since the Penguins were not the owners of the Arena. Even if the plaintiff did know of the Penguins' limited authority, the Agreement does not express it. However, the paragraph remained which provides "... the Operator [Penguins] has the exclusive right to sell advertising space in the Stadium [Arena]...". *Id.* at 1.

## C. *Dispute*

In 1977, following the creation of the advertising contract between plaintiff and the Penguins, signs advertising plaintiff's Marlboro Cigarettes were mounted on the Arena scoreboard. Each subsequent year, the plaintiff paid the $13,500.00 as required. This money was divided between the Authority and the Penguins, as provided for in their Agreement; the Authority received 25% and the Penguins received 75%. Plaintiff's Ex. 5 ¶ 4.

In early 1978, shortly after the DeBartolo Corporation took control of the Penguins, J. Paul Martha, Vice-President and General Counsel for the Penguins, reviewed all of the contracts entered into by the Penguins, including the advertising contract between plaintiff and the Penguins.[3] In late 1978, he reached the opinion that the contract was unenforceable because the advertising space Agreement between the Authority and the Penguins terminated in May, 1978. Martha Tr. pp. 58–59. Thus, he opined that the Philip Morris—Penguin contract also expired in May, 1978. Even though he was of that

**3.** In 1978, Mr. Martha worked solely for the Penguins. He currently retains his position for the Penguins. However, in addition he is Managing General Partner for CAC, Vice-President and General Counsel for the Pittsburgh Spirit, Inc., (a corporation owned by the DeBartolo Corporation which owns and operates a professional soccer team), and President of the Pittsburgh Maulers (a United States Football League team recently purchased by Edward J. DeBartolo, Sr.). Martha Tr. pp. 13, 18, 19.

opinion, nothing was done at that time by the Penguins to stop performance on the Philip Morris contract. In 1978, 1979 and 1980, plaintiff's payments continued to be accepted and split .between the Authority and the Penguins.

In July, 1981, CAC took control of the Arena. Thus, CAC shared in the revenue of the 1981 payment made by Philip Morris.[4]

In early 1982, Mr. Martha met with Mr. William Strong, Vice-President of Communications for CAC. He showed Mr. Strong the advertising contract between Philip Morris and the Penguins and told him that he thought it was unenforceable. Mr. Strong reviewed the document and concurred. Still nothing was done. Plaintiff continued in 1982 to send its payment for $13,500.00 which was accepted and shared by CAC, the Penguins and the Spirit.

In the early part of 1983, CAC and the Penguins decided that the Arena needed a new scoreboard since the old board had been malfunctioning for quite awhile. Therefore, bids were sought from various sign manufacturers.

In a letter sent to Mr. Strong on March 22, 1983, Jim Turner, Sports Systems Specialist for AS & I, outlined his proposal for the new scoreboard. It is customary in the business that advertisers assume much of the cost of the new scoreboards on which their advertisements appear. Therefore, within the AS & I proposal is a section entitled "Advertising Sales." This section provides:

> Considering other arenas in the country and the revenue being brought in, following is a breakdown of the advertising revenue we believe can be obtained. This is based on the fact that *the existing Marlboro contract be broken if they do not wish to participate.*

| | |
|---|---|
| Top Panel plus | $100,000 per year |
| Bottom Panel | 85,000 per year |

| | |
|---|---|
| Timer Panel | $15,000 per year |
| Center Panel | 10,000 per year |
| Total Revenue | $210,000 per year |

(Emphasis supplied.) Plaintiff's Ex. 11, p. 5.

The Penguins and CAC accepted AS & I's proposal and a letter of intent was executed on July 21, 1983. AS & I subsequently entered into a tentative sponsorship agreement with the R.J. Reynolds Tobacco Company. It was at this time that the Penguins and CAC decided to do something about the Philip Morris contract.

In June, 1983, Messrs. Strong and Turner met with Mr. Weiner at the Philip Morris office in New York. They proposed to Mr. Weiner that Philip Morris pay $100,000.00 per year for advertising rights at the Arena; rights Philip Morris already thought it had under the 1977 contract. The contract proposed actually granted less to Philip Morris than it had under the original contract. Since he believed the first contract was still in effect, Mr. Weiner refused to accept the offer and contacted Philip Morris's counsel.

This litigation ensued.

### III. *Conclusions of Law*

#### A. *Jurisdiction*

We have jurisdiction in this case pursuant to 28 U.S.C. § 1332; diversity of citizenship exists, and the amount in controversy exceeds $10,000.00.

#### B. *Powers under the Authority-Penguins Agreement*

Before any findings can be made as to the advertising contract between the plaintiff and the Penguins, it is necessary to look at the Authority-Penguins Agreement to see what authority the Penguins had to enter into such contracts.

Paragraph 1 of the Agreement clearly sets forth the Penguins' authority as "the right to sell advertising space and to affix advertising panels ... on the interior of the Civic Arena ... " Plaintiff's Ex. 5. The only "restrictions" were that all sales con-

---

**4.** Sometime after CAC took control, the division of all advertisement revenue changed. Since the time of CAC's takeover, all revenues are split 40% to CAC, 40% to the Penguins and 20% to the Spirit.

tracts and advertisements had to be submitted to the Authority for final approval. *Id.* at ¶ 2 and ¶ 7. The type of sales contracts, the elements of the contracts, and other specifics of the contracts into which the Penguins could enter were not set forth anywhere in the Agreement. This unequivocal right to sell advertising space ended May 31, 1978.

■ In construing the rights under an agreement which has clear and unambiguous terms, such as this Agreement, a court need only look to the words of the contract. *Kleintop v. Kleintop*, 291 Pa.Super. 491, 436 A.2d 223 (1981). The rights granted to the Penguins by the Agreement are clearly unencumbered. The defendants argue, however, that the expiration date of the Agreement placed limitations on the contracts into which the Penguins could enter; i.e., the Penguins could not enter into a contract for the sale of advertising that extended beyond May 31, 1978. We believe that the Penguins could engage in the sale of advertising up to May 31, 1978. They had to stop selling as of that date, but nowhere does the contract say that the life of their contract for the sale of advertising could not extend beyond May 31, 1978.

■ When considering two parts of a contract, the court must not interpret the sections in such a way that the meanings will be altered. *Department of Transportation v. Acchioni and Canuso, Inc.*, 14 Pa.Cmwlth. 596, 324 A.2d 828 (1974). The two parts must be read together and harmonized if possible. *Thermice Corp. v. Vistron Corp.*, 528 F.Supp. 1275 (E.D.Pa. 1981).

In applying these legal precepts to this Agreement, it is clear that only one interpretation will respect paragraph 1 and the termination date: this is that the Penguins had the authority to sell *any* sales contract, even a long-term contract, up to May 31, 1978. After that date, the Penguins had no right to sell space, but that date did not terminate any valid contract whose life extended beyond that time. Had the Authori-

ty meant to grant to the Penguins power to grant only short-term contracts, the language of paragraph 1 would have included such a limitation. The language clearly is not so restrictive.

Interestingly enough, we note with some surprise a section in the defendants' brief which reads:

> In seeking the preliminary injunction, Philip Morris overlooks a critical fact that was well-known to it at the time it entered into the agreement with the Penguins ... Namely, the Penguins' *Unfettered* right to sell advertising space ... terminated on May 31, 1978 ...

(Emphasis supplied.) Defendants' Brief, p. 6.

There is no question that the Penguins' right to sell advertising space ended May 31, 1978. But, as the defendants themselves argue, prior to May 31st, the right to sell was "unfettered."

■ In addition to the unambiguous terms of the Agreement, the subsequent actions of the parties support a finding that the Penguins had an unlimited right to sell advertising space at the Arena. Acts of the parties may be used as an aid in interpreting an agreement. *Arnold v. Great Atlantic & Pacific Tea Co., Inc.*, 502 F.Supp. 331 (E.D.Pa.1981). *See also*, 4 Williston on Contracts, § 607 (3d Ed.1961).

Several of the paragraphs in the Agreement and the intended actions of the Authority implied from those paragraphs add credence to our holding. These sections are the ones which required the Penguins to advise the Authority of all contracts into which it entered pursuant to the Agreement and gave the Authority the right to approve or disapprove of any contract. *See* Plaintiff's Ex. 5, ¶¶ 2 and 7. It can only be assumed that this practice was followed and that the Authority saw and approved the Philip Morris—Penguins contract. This assumption comes from the official minutes of the Authority's meetings. *See, e.g.*, Plaintiff's Exs. 6 and 7.

In the minutes of a meeting held on April 30, 1979 (one year after the expiration of the Authority—Penguins Agreement), the members discussed replacing the scoreboard, the board on which plaintiff's Marlboro advertisements were mounted. The minutes state "[t]he Authority staff will work with the Penguins on this matter because of the advertising agreement with them." Plaintiff's Ex. 6, ¶ 4. Obviously, the Authority knew of the contract between the plaintiff and the Penguins and its continuing implications as to the scoreboard, or the Authority would not have felt compelled to consult the Penguins as to its replacement.

The minutes of the Authority meeting of October 22, 1979 also reflect the Authority's knowledge and approval of the Philip Morris—Penguins contract. Again, the acquisition of a new scoreboard was discussed as was "the divisions of any scoreboard advertising revenue with the Penguins." Plaintiff's Ex. 7. This division of revenue was part of their Agreement; 25% of the revenue generated from the Marlboro displays which were placed on the scoreboard because of the 1977 contract between Philip Morris and the Penguins were acknowledged and accepted by the Authority over one and one-half years after the Agreement terminated.

Finally, in a memorandum dated October 9, 1979 entitled "Advertising Contracts— Arena 1979–80 Season," sent from Donald M. LeRose, the then Director of Sales & Marketing for the Penguins to Charles Strong of the Authority, the first item listed is "1. *Scoreboard:* Marlboro—$13,-500.00 annually." Plaintiff's Ex. 10. The memorandum also states that "the *majority* of the contracts [in effect during the Penguins 1979–80 season] are for twelve (12) months." "(Emphasis supplied.) *Id.* Obviously, some of the contracts, including the Philip Morris contract were for longer periods of time.

All of these documents show that the Authority knew of the long-term Philip Morris—Penguins contract and accepted it.

The Agreement was not violated since the Penguins were allowed to enter into long-term contracts.

The defendants argue that the Authority's acquiescence in the Agreement after May 13, 1978 merely converted the Agreement between the Authority and the Penguins into one which was terminable at will. Several cases were cited in the defendants' brief to support this argument. We agree that this would be true if this were the situation at hand. However, the holdings of these cases are irrelevant. There is no issue in the case at bar as to whether the Penguins had authority *after* May 31, 1978 to enter into contracts. It is clear that they did not. We are not concerned with the Authority—Penguins Agreement and whether it continued after the termination date and thus became terminable at will. This Agreement is not the one which the plaintiff seeks to enforce. What is at issue here is a separate, distinct, independent contract which was entered into by the Penguins *prior* to the May, 1978 expiration of the Penguins' authority. Therefore, whether or not the Authority—Penguins Agreement to sell advertising space continued beyond this date does not have any effect on this case.

Since the Penguins had the power under the 1977 Agreement to enter into contracts which would continue past May 31, 1978, the Phillip Morris—Penguins advertisement contract is valid and enforceable until its termination in 1987.

## C. *CAC's Assumption of the Philip Morris—Penguins' Contract*

■ The defendants argue that even if the Philip Morris—Penguins contract is enforceable, it is not enforceable against CAC, the present operator of the Arena, since CAC did not assume any obligations under the Authority—Penguins Agreement when it took control of the Arena in July, 1981, including obligations pursuant to contracts entered into by the Penguins while it had the authority. Thus, CAC claims that

it cannot be required to abide by the Philip Morris—Penguins contract.

In support of its position, CAC argues that, when CAC took operational control of the Arena in July, 1981, a list of all of the Authority's contracts assigned to CAC were prepared. Plaintiff's Ex. 13. This list does not include the Authority—Penguins Agreement.

It is true that the Agreement is not on the list and, therefore, was not expressly assigned. A logical explanation as to why this Agreement was not on the list is that the Agreement had expired in 1978, three years before CAC took control of the Arena. Since it no longer was in effect, it was not necessary that the Agreement be expressly assigned. This, however, does not mean that the obligations which were legally acquired by the Penguins under the Agreement are no longer in effect.

Even though the Agreement was not expressly assigned, CAC's acts of accepting and sharing for two years the revenue generated by the Philip Morris contract, even after its General Counsel stated his belief that the contract was unenforceable, estop CAC from denying assumption and subsequent liability.

The doctrine of equitable assignment was enunciated in *Lietka v. Hambersky*, 167 Pa.Super. 304, 308, 74 A.2d 698, 700 (1950). In *Lietka*, the court held that this doctrine must be

> enforced whenever the [entity] making the payments [Philip Morris] stands in such relations to the premises or to the other parties that [its] interest..., can only be fully protected and maintained by regarding the transaction as an assignment...

The intent of the parties is implied from acceptance by CAC of benefits under the contract. *Walker v. Phillips*, 205 Cal. App.2d 26, 22 Cal.Rptr. 727 (1962).

In the case, *sub judice*, Mr. Martha, who is general counsel for the Penguins and general managing partner of CAC, testified that he had decided in 1978 that the Philip Morris contract was unenforceable. He relayed this message, in 1982, to Mr. Strong, another CAC executive. However, since 1981, CAC has accepted 40% of the revenue generated from the contract, even though its executives thought that the contract was invalid! It was not until 1983, when CAC learned from AS & I that the scoreboard advertisements could generate over $100,000.00 in revenue, that CAC decided to terminate the Philip Morris contract. Through its silence and acceptance of the revenue for two years, it may be implied that CAC assumed the Philip Morris—Penguins contract.

### D. *CAC is Estopped from Repudiating the Philip Morris—Penguins Contract*

The defendants strongly argue that CAC and the Penguins are two separate corporate entities, and as such, CAC cannot be responsible for the Penguins' actions. Though, on paper, it is true that the entities are separate corporations, in reality, what benefits CAC benefits the Penguins, and visa versa.

The DeBartolo Corporation (wholly owned by three members of the DeBartolo family) ownes both CAC and the Penguins. In 1977, when the Philip Morris contract was created, Mr. DeBartolo, Sr. owned the majority of the Penguins. One of his concerns was that the Penguins were in bad need of revenue. Thus, the Penguins were willing to enter into a ten-year, $13,500.00 per year contract with Philip Morris. Now, in 1983, the DeBartolo Corporation, which acquired Mr. DeBartolo's interest in the Penguins in 1978, realizes that it can get 80% of $100,000.00 (40% for CAC and 40% for the Penguins) if the plaintiff's contract is rescinded. Though the revenue would technically go to two separate corporations, in the end, one corporation benefits—The DeBartolo Corporation. We will not go so far as to say that the Penguins are an agent of CAC, but certainly CAC benefits from the actions of the Penguins, and, in

this situation, must also share in their obligations.

CAC, through its officers, had actual knowledge of the Philip Morris contract and its implications from the time of CAC's creation in 1981. However, through its words and conduct, it chose to do nothing for two years, therefore, inducing the plaintiff to believe that there was no opposition to the contract. As a result, CAC is estopped from repudiating the Philip Morris—Penguins contract. *Shoemaker's Account*, 277 Pa. 424, 121 A. 510 (1923). *See also, Airco Speer Carbon—Graphite v. Local 502*, 494 F.Supp. 872 (W.D.Pa.1980).

### E.   *AS & I's Liability*

■   At the close of the hearing, counsel for AS & I moved that the claims against it be dismissed. We will grant their motion.

The plaintiff charges AS & I with interference and conspiracy to interfere with the contract. Though it is true that AS & I was ill-advised in its proposal to suggest that possibly the Philip Morris contract could be "broken," there is no evidence that it instigated this action. CAC and the Penguins sought bids for the new scoreboard from various companies, one being AS & I. AS & I did not seek out CAC and the Penguins. In response to CAC and the Penguins, it submitted a bid. It was the other defendants which chose to heed AS & I's advice and break the contract. AS & I cannot be responsible for the other defendants' actions. As such, the amended complaint against AS & I will be dismissed.

### F.   *Standard for Granting a Preliminary Injunction*

The plaintiff is seeking a preliminary injunction as to CAC and the Penguins to prevent the defendants from rescinding the Philip Morris—Penguins advertisement contract by installing a new scoreboard with advertisements from a different tobacco company and from violating the contract in any other manner.

■   Before a preliminary injunction may be granted, the moving party must demonstrate a reasonable probability of success in the litigation and irreparable harm if relief is not granted. *Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir.1982). In order to show irreparable harm, the plaintiff must make a "clear showing of immediate, irreparable injury." *Ammond v. McGahn*, 532 F.2d 325, 329 (3d Cir.1976). Furthermore, to be irreparable, an injury must be of such a nature that it cannot be compensated by money damages. *Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 952, 39 L.Ed.2d 166 (1973).

■   As stated previously, we consolidated the hearing on the motion for a preliminary injunction with a trial on the merits. Therefore, the plaintiff has been successful in the litigation and has won on the merits.

As we stated at the beginning of our opinion, if plaintiff's advertisement displays are replaced, immediate and irreparable harm will occur. The loss of potential customers who are persuaded by the advertising will be a loss that cannot be calculated in money damages.

### III.   *Conclusion*

As a result of the aforementioned Findings of Fact and Conclusions of Law, we will order that a permanent injunction be issued against CAC and the Penguins enjoining them from removing the plaintiff's advertisement displays on the Arena scoreboard and from interfering with any other rights granted to the plaintiff by the 1977 Philip Morris—Penguins contract.